# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Brown, 2012 IL App (1st) 091940**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANTE BROWN, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-09-1940 |
| Filed | April 16, 2012 |
| Rehearing denied | May 9, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's motion to suppress a videotaped statement he provided to the police was properly denied and the statutorily mandated sentence of natural life in prison without the possibility of parole imposed following his conviction on an accountability theory of two counts of first degree murder was affirmed, notwithstanding his contentions that he had cognitive disabilities that prevented him from knowingly and intelligently waiving his *Miranda* rights and that the mandatory sentence was unconstitutionally disproportionate in view of those disabilities and his relative youth, since the finding that defendant's rights were validly waived was not unreasonable or arbitrary and was based on the evidence, and he failed to demonstrate that his sentence was unconstitutionally disproportionate. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 03-CR-27803; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier and Jennifer Bontrager, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Marie Quinlivan Czech, and Mary Beth Kinnerk, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.

Presiding Justice Hoffman and Justice Karnezis concurred in the judgment and opinion.

**OPINION**

¶ 1      Following a jury trial, defendant, Dante Brown, was convicted on an accountability theory of two counts of first degree murder and was sentenced to a statutorily mandated sentence of natural life in prison without the possibility of parole. On appeal, defendant asserts that: (1) in light of the evidence of his cognitive disabilities, the trial court improperly denied defendant's motion to suppress a videotaped statement he provided to police on the grounds that he did not intelligently and knowingly waive his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966); and (2) those same cognitive disabilities, and his relative youth, rendered defendant's mandatory natural life sentence unconstitutionally disproportionate. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3      Defendant and his codefendant, Dwight Allen, were charged by indictment with the October 6, 2003, murders of Charles Edwards III (G-Red or Red) and Charles Edwards IV (Little Rock)[1], as well as multiple counts of home invasion, armed robbery, residential burglary, and aggravated unlawful use of a weapon. The record reflects that defendant and Mr. Allen were charged with murder on the basis of their accountability for the actions of defendant's cousin, Corey Singleton, who actually committed the murders. Mr. Allen pleaded guilty to a single count of murder in exchange for a sentence of 30 years' imprisonment and his promise to testify against Mr. Singleton should he ever be charged. While defendant's brief indicates that he rejected a similar plea, there is no evidence of this in the record. In any case, the charges against defendant proceeded to a jury trial in June of

_____

[1]In this opinion, the victims will be referred to–as they were in the trial court–by their nicknames.

2008.

¶ 4    Prior to trial, defendant was referred to the circuit court's forensic clinical services for an evaluation as to his fitness to stand trial. It appears that this referral may have been made in response to a letter defendant's mother wrote to the trial court referencing defendant's low intelligence quotient (IQ) scores and history of special education. In March of 2007, a licensed clinical psychologist examined defendant and subsequently informed the trial court that defendant was fit to stand trial.

¶ 5    Defendant also filed a pretrial motion to suppress a videotaped statement he gave on November 15, 2003, when he was 19 years old. The record reveals that on the day before this statement was given, defendant was in police custody and being investigated for an unrelated offense along with Mr. Singleton. At that time, and after he had previously been informed of his *Miranda* rights, defendant asked Officer (now Detective) Carolyn Keating if he could tell her something. Defendant then told Officer Keating that Mr. Singleton had killed G-Red and Little Rock. Defendant explained that he knew this "because [he] was there." Officer Keating, who was not then aware of the two murders, contacted the detectives working on the homicide investigation.

¶ 6    Defendant was thereafter interviewed by those detectives, as well as by Assistant State's Attorney (ASA) Andreana Turano. Before each interview, defendant was again informed of his *Miranda* rights and agreed to waive those rights. He then went on to describe his involvement in the murders. Finally, defendant agreed to memorialize his statement on videotape, and that videotaped statement was introduced as evidence at the hearing on the motion to suppress.

¶ 7    That video begins with defendant acknowledging that he had previously been provided his *Miranda* rights and agreed to speak with the police. Defendant is then again informed of his *Miranda* rights. Defendant thereafter indicated that he both understood and waived those rights, and he orally agreed to have his statement videotaped; defendant also acknowledged that he had previously consented to the videotaped statement in writing. He then began answering the ASA's questions about the events of October 6, 2003.

¶ 8    Defendant stated that on that date, Mr. Singleton picked him up at his home in a blue Lumina driven by a man defendant called "Jermaine," the name by which he knew codefendant Mr. Allen.[2] All three were members of the Black P-Stone street gang. They drove around some time, smoking and drinking. They then drove to Mr. Singleton's home so that Mr. Singleton could retrieve a .38-caliber handgun. Defendant asked to see that gun, and upon inspection he saw that the magazine clip was loaded with 10 rounds of ammunition. Defendant then returned the gun to Mr. Singelton, and Mr. Singleton explained that they were all going to rob G-Red at his home. G-Red was the leader of the same gang, but had recently had someone try to kill Mr. Singleton.

¶ 9    Upon arriving at G-Red's home, Mr. Singleton observed through the window that G-Red appeared to be the only person at home. Before kicking the rear door in and entering, defendant saw Mr. Singleton cock the gun. Defendant was unarmed at the time. Defendant

---

[2]We will also refer to Mr. Allen by the nickname defendant used below.

covered his face with a mask and Jermaine had covered his face with a stocking cap. Mr. Singleton had not covered his face, and when defendant was asked why not, defendant stated that Mr. Singleton intended to kill G-Red.

¶ 10 Once inside, Mr. Singleton confronted G-Red and ordered him to give up "every \*\*\* thing you got in this house or I'm gonna kill you." Defendant, Mr. Singleton, and Jermaine ransacked the house, taking drugs, clothes, and jewelry. During the course of the robbery, Mr. Singleton shot both G-Red and Little Rock–who was G-Red's 16-year-old son–multiple times, killing both.

¶ 11 Thereafter, defendant was taken back to his home. Mr. Singleton kept the items defendant had stolen, giving defendant $50 in cash because they "didn't get too much of nothing" in the robbery. Mr. Singleton also told defendant not to tell anyone what had happened.

¶ 12 After the video was introduced at the hearing on the motion to suppress, defendant presented the testimony of Dr. Nancy Cowardin, who held a doctorate in special education and psychology and was accepted as an expert in educational psychology and special education, as well as a developmental learning specialist. She testified that she was hired by the public defender to assess defendant, and she completed a number of interviews and a battery of tests with him in May of 2004.

¶ 13 Dr. Cowardin testified that the results of these interviews and tests revealed that defendant's general level of intellectual functioning was quite low. His overall IQ score was within the range of those classified as mentally retarded, he read at a first-grade level, and his math skills were at a third-grade level. He had demonstrated difficulties in receiving, processing, and expressing information. She testified that some of these deficiencies were exhibited in the videotaped statement, noting single instances where defendant had difficulty remembering Jermaine's name and the name of the car Jermaine was driving, as well as making errors in syntax.

¶ 14 With regard to the *Miranda* warnings that defendant was provided, Dr. Cowardin testified that they were "coded" to the level of a 12- or 13-year-old child, a level above that which defendant's test results indicated he could understand. The understanding defendant displayed in the video may have been superficial only and an example of "masking" his actual misunderstanding. She further stated that defendant did very poorly on the verbal portion of the so-called "Gisso" test, which tested his ability to understand the *Miranda* warnings. Defendant, however, did "very, very well" when the concepts contained in those warnings were presented pictorially, earning "a hundred out of a possible hundred points" on that portion of the test.

¶ 15 Ultimately, Dr. Cowardin expressed concerns and doubts about defendant's ability to understand the *Miranda* warnings that were provided to him in the videotape. However, on both direct and cross-examination, Dr. Cowardin indicated that she could not be certain that he did not understand those warnings, testifying that it was indeed possible he could have understood them.

¶ 16 At the conclusion of Dr. Cowardin's testimony, defendant indicated that he had no other evidence to introduce in support of his motion to suppress. The State then made a motion for

directed finding, which the trial court granted and thus also denied defendant's motion. The trial court found that Dr. Cowardin's testimony was "more relevant to teaching the defendant rather than the particular issue at hand" and "at best you would have to characterize her contribution to this [as] *** he may have not understood. I don't know."

¶ 17 The matter proceeded to a jury trial, where defendant's videotaped statement was introduced as evidence by the State. The State also introduced other testimony and evidence regarding the police investigation, including evidence that defendant's fingerprints were found at G-Red's home and that G-Red and Little Rock died of multiple gunshot wounds. Dr. Cowardin also testified at trial, with her trial testimony similar to the testimony she provided at the suppression hearing. Defendant was ultimately found guilty, on a theory of accountability, of two counts of first degree murder.

¶ 18 Defendant's motion for a new trial was denied. The matter proceeded to a sentencing hearing, at which defendant presented a motion that–acknowledging the fact that defendant's convictions for multiple murders called for a statutorily mandated life sentence–asked the trial court to impose a reduced sentence in light of the evidence of defendant's youth and mental retardation. The trial court denied this motion. The State recounted the facts of the case and defendant's criminal history in aggravation, and defendant again stressed his youth at the time of the crime and the evidence of his mental retardation in mitigation. After expressing frustration with the lack of discretion provided by the sentencing statute, the trial court sentenced defendant to a term of natural life without the possibility of parole. Defendant's motion to reconsider this sentence was denied, and he thereafter timely appealed.

¶ 19 II. ANALYSIS

¶ 20 On appeal, defendant challenges both the trial court's denial of his motion to suppress and his mandatory sentence of natural life in prison.

¶ 21 A. Motion to Suppress

¶ 22 We first address defendant's contention that the trial court improperly denied his motion to suppress the videotaped statement on the grounds that his *Miranda* rights were not intelligently and knowingly waived.

¶ 23 1. Legal Framework and Standard of Review

¶ 24 Both the fifth amendment to the United States Constitution (U.S. Const., amend. V) and article I, section 10, of the Illinois Constitution (Ill. Const. 1970, art. I, § 10) provide that no person shall be compelled in any criminal case to be a witness against himself. The United States Supreme Court has "extended the fifth amendment privilege against self-incrimination to custodial interrogation and required that a defendant be warned that he or she has the right to remain silent, he or she has the right to an attorney, and that any statement given may be used against him or her in a court of law." *People v. Dennis*, 373 Ill. App. 3d 30, 42 (2007) (citing *Miranda*, 384 U.S. at 475-77). As such, "before a defendant's confession can be

admitted at trial, the State must prove by a preponderance of the evidence that defendant validly waived [his or] her privilege against self-incrimination and [his or] her right to counsel." *People v. Daniels*, 391 Ill. App. 3d 750, 780 (2009). " 'Once the State has established its *prima facie* case, the burden shifts to defendant to show that his [*Miranda*] waiver was not knowing, intelligent or voluntary.' " *People v. Johnson*, 385 Ill. App. 3d 585, 591 (2008) (quoting *People v. Reid*, 136 Ill. 2d 27, 51 (1990)).

¶ 25 A valid waiver of *Miranda* rights occurs where: (1) the decision to relinquish those rights was voluntary in the sense that it was not the product of intimidation, coercion, or deception; and (2) it was made with a full awareness of the nature of the rights being abandoned and the consequences of the decision to abandon them. *People v. Crotty*, 394 Ill. App. 3d 651, 662 (2009). The validity of a *Miranda* waiver is a question of fact, which must be determined in light of the totality of the circumstances. *Id*. "The crucial test to be used in determining whether an accused knowingly and intelligently waived [his or] her rights is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of [his or] her rights." *Daniels*, 391 Ill. App. 3d at 781.

¶ 26 Finally, "[i]n reviewing a trial court's decision as to whether defendant's confession was voluntary, we apply a bifurcated standard of review. Although we review *de novo* the ultimate question of whether the confession was voluntary, because the subissue of whether a *Miranda* waiver was knowing and intelligent is factual, we review it under a manifest weight of the evidence standard." *Id.* at 780 (citing *In re G.O.*, 191 Ill. 2d 37, 50 (2000)). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence presented." *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). Furthermore, under this standard we are to give deference to the trial court as the finder of fact, and we will not substitute our judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn therefrom. *Id*.

¶ 27         2. Burden Shifting

¶ 28 Defendant initially contends that the trial court improperly shifted the burden of proof on this issue when, in denying his motion to suppress, the court stated that "it's the defense's burden to show a violation of *Miranda*." We disagree.

¶ 29 First, we note that this issue has been raised for the first time on appeal, as the record reveals that defendant did not object on this basis at the time the trial court ruled on the motion to suppress and did not raise this issue in a posttrial motion. When, as here, a defendant fails to object to an error at trial and fails to include the error in a posttrial motion, appellate review of that error is generally considered to be forfeited and the matter subject only to review for plain error. *People v. Johnson*, 238 Ill. 2d 478, 484 (2010). Under the plain error doctrine, a reviewing court may consider a forfeited claim where:

> " '(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so

serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the strength of the evidence.' " *Id.* (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

¶ 30    We also note that the State rejected defendant's assertions with respect to this issue in its brief before this court. Nevertheless, at oral argument the State appeared to concede that the trial court had indeed improperly shifted the burden to defendant, while also asserting that defendant could not establish that this improper burden-shifting amounted to plain error.

¶ 31    We find that, despite the parties' contentions with respect to waiver and plain error, the burden was not improperly shifted in this case. As discussed above, the State had the initial, *prima facie* burden of proving that defendant made a knowing, intelligent and voluntary waiver of defendant's rights, and only thereafter did the burden shift to defendant to show that his waiver was not knowing, intelligent or voluntary. *People v. Reid*, 136 Ill. 2d 27, 51 (1990). However, "[t]he circuit court may, in its discretion, reverse the order of proof so that defendant presents his or her evidence first." *Id.*

¶ 32    In this case, the record reveals that the hearing on the motion to suppress began with defense counsel indicating that she would like to obtain an agreement with the State to admit defendant's videotaped statement into evidence or to offer the videotape into evidence as a joint exhibit. The State indicated it had no objection to the introduction of the videotape. Notably, the videotaped statement clearly shows that defendant was informed of his constitutional rights and then waived them. The trial court was thereafter presented with Dr. Cowardin's testimony, with that testimony subject to the State's cross-examination. Only after all of this evidence was introduced did the trial court grant the State's motion for a directed finding and deny defendant's motion to suppress, indicating as it did so that "it's the defense's burden to show a violation of *Miranda*."

¶ 33    When we review the record in its entirety, we do not believe that the burden of proof was improperly shifted to defendant. At the time the trial court ruled, it had been presented with clear, uncontroverted, and videotaped evidence showing that defendant had been informed of his constitutional rights, had indicated he understood those rights, and had then waived them prior to giving his statement. It has long been recognized that "[t]he State's burden of proof is proof by a preponderance of the evidence, and not proof beyond a reasonable doubt." *People v. Cozzi*, 93 Ill. App. 3d 94, 98 (1981). Furthermore, the State may meet its initial burden by establishing that a defendant was advised of his constitutional rights and then indicated that he both understood those rights and was waiving them. *Id.* Thus, we find that the videotaped evidence in this case satisfied the State's initial burden and properly shifted the burden to defendant to show that his waiver was not knowing, intelligent or voluntary, *i.e.*, "to show a violation of *Miranda*."

¶ 34    We believe that it was exactly this second-step burden the trial court was referring to and that, when read as a whole, the trial court's comments in denying defendant's motion to suppress reflect that it properly placed the initial burden of proving a *prima facie* case on the State and only then shifted the burden to defendant. Courts have previously come to the same conclusion when faced with similar factual circumstances. See *Reid*, 136 Ill. 2d at 51-54; *People v. Wheeler*, 226 Ill. App. 3d 1092, 1100-01 (1992); *Cozzi*, 93 Ill. App. 3d at 98-99.

¶ 35    As such, we reject the argument that the trial court improperly shifted the burden of proof to defendant on this issue. This conclusion necessarily leads us to reject defendant's assertions of plain error as well. *People v. Bannister*, 232 Ill. 2d 52, 79 (2008) ("Having found no error, there can be no plain error."). Moreover, even if we did find that the trial court improperly shifted the burden in this case we would not find that this mistake amounted to plain error. As the substantive discussion below will establish, regardless of where the trial court placed the burden, it properly denied defendant's motion to suppress.

¶ 36                            3. Substantive Discussion

¶ 37    Thus, we now reach the merits of defendant's challenge to the denial of his motion to suppress the videotaped statement. Here, there is no contention that defendant's videotaped statement resulted from any type of intimidation, coercion, or deception. Rather, the sole question is whether it was made after defendant knowingly and intelligently waived his *Miranda* rights.

¶ 38    As we noted above, the key question is whether–after considering the words used and the context of the interrogation of defendant, as well as his age, background, and intelligence–defendant was provided a clear, understandable warning of all of his *Miranda* rights. *Daniels*, 391 Ill. App. 3d at 781. As such, "[t]he mental capacity of a defendant must be taken into consideration in determining whether a waiver was valid." *In re W.C.*, 167 Ill. 2d 307, 328 (1995). This is because "it is generally recognized that the mentally retarded are considered more susceptible to police coercion or pressure than people of normal intellectual ability, they are predisposed to answer questions so as to please the questioner rather than to answer accurately, they are more likely to confess to crimes they did not commit, they tend to be submissive, and they are less likely to understand their rights." *People v. Braggs*, 209 Ill. 2d 492, 514 (2003).

¶ 39    Nevertheless, "mental deficiency, of itself, does not render a statement unintelligent" but is, rather, one factor that must be considered along with the totality of the circumstances under which *Miranda* rights were waived and a statement or confession given. *In re W.C.*, 167 Ill. 2d at 328. As our supreme court has summarized:

        "If intelligent knowledge in the *Miranda* context means anything, it means the ability to understand the very words used in the warnings. It need not mean the ability to understand far-reaching legal and strategic effects of waiving one's rights, or to appreciate how widely or deeply an interrogation may probe, or to withstand the influence of stress or fancy; but to waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail." *People v. Bernasco*, 138 Ill. 2d 349, 363 (1990).

¶ 40    Any number of cases have considered the question of whether a *Miranda* waiver was intelligently and knowingly made in light of a defendant's limited mental capacity. In some cases, courts have found that evidence of defendant's mental retardation rendered the *Miranda* waivers at issue invalid. See, *e.g.*, *Braggs*, 209 Ill. 2d at 515-16; *Daniels*, 391 Ill. App. 3d at 787; *Bernasco*, 138 Ill. 2d at 368; *People v. Robinson*, 301 Ill. App. 3d 634, 642 (1998). In other cases, evidence of a defendant's mental retardation was insufficient to

establish that such a waiver was not made intelligently and knowingly. See, *e.g.*, *In re W.C.*, 167 Ill. 2d at 334-35; *People v. Mahaffey*, 165 Ill. 2d 445, 462-63 (1995); *Reid*, 136 Ill. 2d at 58-60; *People v. Travis*, 170 Ill. App. 3d 873, 885-86 (1988). In the end, however, these cases are of limited value here, as the question of whether a defendant has intelligently waived his *Miranda* rights "depends, in each case, on the particular facts and circumstances of that case." *Bernasco*, 138 Ill. 2d at 368.

¶ 41    Turning to the facts of *this* case, defendant has highlighted evidence which he asserts calls the validity of his *Miranda* waiver into question. Defendant primarily relies upon the testimony of Dr. Cowardin about the results of her evaluation. Dr. Cowardin testified that defendant's full-scale IQ score was 64, which fell within the range of scores establishing mental retardation. Defendant's language skills were on a first-grade level, while his math skills were at a third-grade level. Dr. Cowardin testified that defendant was a concrete, literal thinker who was not likely capable of more advanced, abstract thinking. In interacting with others, defendant would therefore "code" statements and concepts down to his level, ignoring or misunderstanding information while outwardly indicating a level of understanding that he did not in fact possess. In summary, defendant's test results indicated he operated at the intellectual level of a five- to nine-year-old child.

¶ 42    With respect to defendant's specific ability to understand the *Miranda* warnings he had been given, Dr. Cowardin testified that these warnings were coded to the level of a 12- or 13-year-old child. Furthermore, defendant did very poorly on the verbal portion of the "Grisso" test, which is designed to evaluate a person's ability to understand *Miranda* warnings. Indeed, a second portion of that test could not be completed because defendant could not read the prompts and could not remember them long enough to complete the test when they were provided verbally. While defendant did very well on that portion of the "Grisso" test that presented *Miranda* concepts pictorially, Dr. Cowardin speculated that this could be the result of defendant's recent interaction with the criminal justice system, including talking with his lawyer and other inmates. Ultimately, Dr. Cowardin expressed concerns–in light of defendant's test scores and her overall evaluation–about defendant's ability to understand the *Miranda* warnings he was provided at the time of his videotaped statement. Finally, defendant notes that the videotape of his statement shows that no attempt was made to simplify, repeat, or explain the *Miranda* warnings he was provided.

¶ 43    In contrast, the State points to evidence supporting its position that defendant's *Miranda* waiver was made both intelligently and knowingly. It first highlights the videotaped statement itself, noting that it clearly shows defendant acknowledging that he had previously received his *Miranda* rights before again being informed of his *Miranda* rights on camera, indicating he understood those rights, and then waiving them. The record reflects that defendant was provided his *Miranda* rights at least three times prior to the videotaped statement.[3] The State also notes that defendant never indicated he had any difficulty

---

[3]Some of this evidence came in the form of trial testimony, which this court may properly consider in reviewing the denial of a motion to suppress on the basis of an alleged *Miranda* violation. *People v. Gilliam*, 172 Ill. 2d 484, 501 (1996).

understanding these warnings in the video and, indeed, showed no significant difficulty in responding to the ASA's other questions or in relating the events surrounding the murders in detail. The State also points out that defendant had at least nine arrests leading to four juvenile adjudications and one adult conviction prior to providing the videotaped statement in this case, which the State asserts established defendant's extensive experience with the criminal justice system.

¶ 44 With respect to Dr. Cowardin's testimony, the State asserts that it was at best equivocal. The State notes that in discussing defendant's IQ score, Dr. Cowardin indicated that defendant's full-scale score was 64, but his nonverbal score was 83. While the full-scale score fell in the "retarded range," the nonverbal score did not. As such, Dr. Cowardin testified that the nonverbal score made it problematic to make a "clean qualification." Indeed, Dr. Cowardin further indicated that defendant's school records indicated that others had similar difficulties in classifying his ability, noting that defendant's schools "kept changing his classification from learning disabled to EMH[,] which means mild mental retardation, as if they couldn't quite decide what to do with him either. I understand why by looking at the scores."

¶ 45 Moreover, the State also notes that while Dr. Cowardin may have testified about some low test scores and expressed some doubts about defendant's abilities, she did not have access to his criminal history at the time she evaluated him and did not know the circumstances of those contacts with law enforcement. Dr. Cowardin could not ultimately conclude that defendant did not in fact understand the *Miranda* warnings he was provided. For example, Dr. Cowardin stated on direct examination that while defendant's indication that he understood the warnings could have been an example of "masking" his actual misunderstanding, she added "[w]e don't know." When asked by defense counsel if defendant could possibly have understood those warnings, Dr. Cowardin testified "[h]e could have, yes."

¶ 46 Finally, the following exchange occurred between defense counsel and Dr. Cowardin on direct examination:

"Q. In the end, are you able to state to a reasonable degree of certainty within your field as an educational psychology, developmental psychology and as a learning and developmental specialist, whether or not during this period of time when [defendant] was interrogated ***, whether he understood his *Miranda* Warnings and intelligently waived them?

A. Is your question is there a definitive answer?

Q. Yes.

A. That, I cannot give you."

This refrain continued on cross-examination, when Dr. Cowardin was asked "you actually–you are unable to give an opinion as to whether [defendant] did or did not understand his *Miranda* Rights at the time they were given to him when he made the statement?" Dr. Cowardin responded: "Yes. Yes. That's accurate."

¶ 47 The trial court agreed with the State, finding defendant's *Miranda* waiver valid. The trial court found that Dr. Cowardin's testimony was "more relevant to teaching the defendant

rather than the particular issue at hand, but after listening to the evidence and viewing the statement, it seems to me that, at best you would have to characterize her contribution to this–he may have, I don't know–that is, he may have not understood. I don't know." In light of the record, we cannot say that the trial court's finding was against the manifest weight of the evidence.

¶ 48 Here, the trial court properly considered all of the evidence presented, which included clear, uncontroverted evidence that defendant was both informed of and waived his *Miranda* rights on multiple occasions and expert testimony regarding defendant's ability to understand those warnings that was equivocal and ultimately inconclusive. The trial court also called the weight of that expert testimony into question, finding that it was "more relevant to teaching the defendant rather than the particular issue at hand." As we noted above, "mental deficiency, of itself, does not render a statement unintelligent," but is rather just one factor that must be considered in the totality of the circumstances. *In re W.C.*, 167 Ill. 2d at 328. Moreover, we give deference to the trial court as the finder of fact, and we will not substitute our judgment for that of the trial court regarding the weight to be given to the evidence or the inferences to be drawn therefrom. *Deleon*, 227 Ill. 2d at 332.

¶ 49 Ultimately, as our supreme court has recognized:

"[T]he credibility and weight to be given psychiatric testimony are matters for the trier of fact, who is not obligated to accept the opinions of defendant's expert witnesses over those opinions presented by the State. [Citations.] In fact, '[e]ven if several competent experts concur in their opinion and no opposing expert testimony is offered, it is still within the province of the trier of fact to weigh the credibility of the expert evidence and to decide the issue *** in light of all of the facts and circumstances of the case ***.' [Citation.]" *People v. Urdiales*, 225 Ill. 2d 354, 431 (2007).

Here, the defense expert's testimony was at best equivocal, and in light of the entire record we cannot say that the trial court's finding that defendant's *Miranda* rights were validly waived was "unreasonable, arbitrary, or not based on the evidence presented." *Deleon*, 227 Ill. 2d at 332. As such, the trial court's denial of defendant's motion to suppress is affirmed.

¶ 50                                    B. Sentencing

¶ 51 We next address defendant's contention that the trial court's imposition of a mandatory sentence of natural life in prison without the possibility of parole amounted to unconstitutional punishment in light of his diminished mental capacity, relative youth, and the fact that he was only convicted on a theory of accountability. We disagree.

¶ 52                      1. Legal Framework and Standard of Review

¶ 53 Defendant was found guilty of two counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2002)) based upon a theory of his legal accountability for the actions of Mr. Singleton (720 ILCS 5/5-2(c) (West 2002)). Pursuant to the Unified Code of Corrections, defendant's two murder convictions carried a mandatory sentence of natural life in prison (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2002)), to be served without the possibility of parole (730 ILCS 5/3-3-

3(d) (West 2002)).

¶ 54    While defendant has challenged the constitutionality of the mandatory sentencing statute, this court has previously recognized:

"A statute is presumed to be constitutional, and, thus, the party challenging it bears the burden of clearly demonstrating its invalidity. [Citations.] It is well settled that the legislature has wide discretion to set penalties for the offenses it defines and such penalties will not be invalidated unless they clearly exceed the very broad constitutional limitations that apply. [Citations.] *** Rather, we are duty-bound to construe a statute in a manner that upholds its validity and constitutionality if this can reasonably be done. [Citations.] This is especially true when the statute's language is certain and unambiguous, thereby indicating the legislature's intent, which must be given effect. [Citations.] Where, as here, we are called upon to examine the constitutionality of a statute, we employ a *de novo* standard of review. [Citation.]" *People v. Kasp*, 352 Ill. App. 3d 180, 185 (2004).

¶ 55    Among the "broad constitutional limitations" on the legislature's discretion to provide specific penalties for specific criminal offenses are the provisions of the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and article I, section 11, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 11). The eighth amendment, applicable to the states by virtue of the fourteenth amendment (see *Robinson v. California*, 370 U.S. 660, 666 (1962)), provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted" (U.S. Const., amend. VIII). In turn, article I, section 11, of the Illinois Constitution of 1970 provides: "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11.

¶ 56    Our supreme court had recognized that our state constitution's "proportionate penalties clause is coextensive with the [federal] cruel and unusual punishment clause." *In re Rodney H.*, 223 Ill. 2d 510, 518 (2006) (citing *People v. Sharpe*, 216 Ill. 2d 481, 517 (2005)). As such, both constitutional provisions incorporate the concept of "proportionality" in criminal sentencing. See *Graham v. Florida*, 560 U.S. ___, ___, 130 S. Ct. 2011, 2021 (2010) ("The concept of proportionality is central to the Eighth Amendment."); *People v. Miller*, 202 Ill. 2d 328, 338 (2002) (pursuant to article I, section 11, of the Illinois Constitution of 1970, "[a] statute may be deemed unconstitutionally disproportionate"). A proportionality analysis under either constitution involves a consideration of evolving standards of decency and fairness to determine the validity of any particular sentence. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2021; *Miller*, 202 Ill. 2d at 339.

¶ 57    Cases addressing such proportionality challenges to criminal sentences have a long history, and a well-established analytical framework has been developed. Nevertheless, defendant contends that this framework was significantly altered by the United States Supreme Court's recent decision in *Graham*, 560 U.S. ___, 130 S. Ct. 2011. Indeed, that framework has been altered, as succinctly outlined in *People v. Gay*, 2011 IL App (4th) 100009, ¶¶ 15-18 (quoting *Graham*, 560 U.S. at ___, 130 S. Ct. at 2021-27):

"Cases challenging the proportionality of a sentence to the crime committed were,

until *Graham* was decided in 2010, divided into two discrete categories: those involving a term-of-years sentence and those involving the death penalty. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2021. In cases challenging a term-of-years sentence, a court would initially engage in a case-by-case proportionality evaluation comparing the 'gravity of the offense' to the 'severity of the sentence.' *Graham*, 560 U.S. at ___, 130 S. Ct. at 2022. If the sentence was grossly disproportionate, the court would compare the sentence to 'the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions.' *Graham*, 560 U.S. at ___, 130 S. Ct. at 2022. If the latter comparison confirmed that the sentence was grossly disproportionate to the offense, the sentence would be found cruel and unusual. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2022.

In cases challenging a capital sentence, the death penalty was found categorically cruel and unusual in certain instances based upon either 'the nature of the offense' or 'the characteristics of the offender.' *Graham*, 560 U.S. at ___, 130 S. Ct. at 2022. ***

The differential treatment of capital and term-of-years sentences before *Graham* reflected the Supreme Court's 'longstanding view that the death penalty is different from other punishments in kind rather than degree.' (Internal quotation marks omitted.) *Graham*, 560 U.S. at ___, 130 S. Ct. at 2038-39 (Roberts, C.J., concurring). Earlier in the opinion, however, the Court stated, '[L]ife without parole sentences share some characteristics with death sentences that are shared by no other sentences.' *Graham*, 560 U.S. at ___, 130 S. Ct. at 2027.

In *Graham*, 560 U.S. at ___, 130 S. Ct. at 2034, for the first time, the Supreme Court recognized a categorical limitation on a term-of-years sentence, holding that life without parole sentences were necessarily unconstitutional when imposed upon juvenile, nonhomicide offenders."

¶ 58    Thus, defendant asks this court to conduct a proportionality analysis of his life sentence in light of the *Graham* decision. However, just exactly what type of analysis defendant asks this court to conduct is not entirely clear. At one point in his briefs before this court, as well as at oral argument, defendant indicates that he is asking that we find the sentence imposed in this case invalid "as applied" to him. However, in another portion of his brief, defendant specifically indicates that–relying upon the *Graham* decision–he is asking this court to more generally "apply a categorical analysis to the mandatory natural life sentence as applied to a mentally retarded individual guilty only by accountability." We also note that throughout his brief and at oral argument, defendant repeatedly relies upon the notion that "*Graham* changed the analysis applicable to non-death-penalty sentencing challenges."

¶ 59    To the extent that defendant contends *Graham* has any relevance to a proportionality challenge brought against an *individual sentence* imposed upon an *individual defendant*, he is simply wrong. As the Supreme Court clearly recognized in that case, the more traditional case-by-case proportionality evaluation comparing the "gravity of the offense" to the "severity of the sentence" is still the appropriate analysis "for considering a gross proportionality challenge to a particular defendant's sentence." *Graham*, 560 U.S. at ___, 130 S. Ct. at 2022. Thus, to the extent that defendant is pursuing such a gross proportionality

challenge here, the analysis in *Graham* simply has no applicability. As the court made clear in *Graham*, its analysis was predicated upon the fact the defendant in that case was raising a more generalized categorical challenge to "a sentencing practice itself." *Id.*

¶ 60    Moreover, such a gross proportionality challenge to defendant's individual sentence is unavailing. Our supreme court has long recognized that a mandatory natural life sentence without the possibility of parole is not an unconstitutionally disproportionate sentence for a defendant convicted of multiple murders. *People v. Taylor*, 102 Ill. 2d 201, 206 (1984). Furthermore, such a sentence is not rendered unconstitutional when the underlying conviction is premised upon a theory of accountability. *People v. Griffin*, 368 Ill. App. 3d 369, 379-80 (2006).

¶ 61    However, as noted above defendant has also specifically asked this court to apply *Graham* and "apply a categorical analysis to the mandatory natural life sentence as applied to a mentally retarded individual guilty only by accountability." To the extent that defendant's challenge can thus be viewed as a categorical challenge to the *sentencing practices* involved here, it lies upon a better foundation. As defendant correctly recognizes, the majority decision in *Graham* does indicate that a categorical analysis is now applicable to categorical challenges to noncapital sentences such as the one imposed here. *Id.* As such, we will address the merits of defendant's challenge on this basis.

¶ 62                          2. Categorical Proportionality Analysis

¶ 63    By pursuing a categorical challenge, defendant is seeking to have this court establish a categorical rule that a mandatory natural life sentence without the possibility of parole imposed upon a mentally retarded adult guilty only by accountability is unconstitutional. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2022. We do note that defendant also appears to contend that his relative youthfulness also calls for a finding that his sentence be found unconstitutional, but does not appear to include that factor in this categorical challenge and certainly does not identify why, at age 19, his "youthfulness" should be considered. In any case, defendant was 19 years old at the time of the murders and was thus not a minor or a "youth." *People v. McCoy*, 337 Ill. App. 3d 518, 525 (2003); 705 ILCS 405/5-130 (West 2002) (excluding from juvenile court's jurisdiction those defendants at least 15 years old charged with first degree murder).

¶ 64    The categorical analysis consists of the following approach:

"The Court first considers 'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue. [Citation.] Next, guided by 'the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose,' [citation], the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution. [Citation.]" *Graham*, 560 U.S. at ___, 130 S. Ct. at 2022.

¶ 65    Here, defendant has made no effort to establish that any objective indicia indicate a national consensus against the specific sentencing practice he challenges here, *i.e.*, a

mandatory sentence of life in prison without the possibility of parole for an adult with mental retardation convicted of multiple homicides solely on an accountability theory. Indeed, defendant does not cite to a single state or federal statute or case invalidating such a sentence imposed upon a similar defendant under the same circumstances. This court's own research has similarly failed to locate any such authority. While we may have failed to uncover *some* existing authority supporting defendant's position, we are confident that authority sufficient to represent a national consensus does not in fact exist.[4] With no objective indicia indicating a national consensus against the challenged sentencing practice, we therefore proceed to the second part of the categorical analysis. See *Gay*, 2011 IL App (4th) 100009, ¶ 28 ("Without evidence of a consensus against the sentencing practice defendant is challenging, we turn to the second step of our analysis."); *People v. Salas*, 2011 IL App (1st) 091880, ¶ 68 (same).

¶ 66    Turning to the second step, the United States Supreme Court has reiterated:

"Community consensus, while 'entitled to great weight,' is not itself determinative of whether a punishment is cruel and unusual. [Citation.] In accordance with the constitutional design, 'the task of interpreting the Eighth Amendment remains our responsibility.' [Citation.] The judicial exercise of independent judgment requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question. [Citations.] In this inquiry the Court also considers whether the challenged sentencing practice serves legitimate penological goals. [Citations.]" *Graham*, 560 U.S. at ___, 130 S. Ct. at 2026.[5]

¶ 67    We thus begin this step of the analysis by considering defendant's characteristics, the most salient of which is the evidence of his mental retardation. With respect to the mentally retarded, the United States Supreme Court has recognized that they:

"frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability." *Atkins v. Virginia*, 536 U.S. 304, 318 (2002).

As a result of these and other concerns, the Court in *Atkins* held that the death penalty "is not

---

[4]We also note that it was defendant's burden to provide this court with citations to any relevant authority on this issue pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008).

[5]Again, because the eighth amendment of the United States Constitution and article I, section 11, of the Illinois Constitution of 1970 are coextensive, these concerns apply equally to defendant's federal and state constitutional challenges. See generally *Miller*, 202 Ill. 2d at 339-40 (applying these same considerations to proportionality claim brought pursuant to our state constitution).

a suitable punishment for a mentally retarded criminal." *Id*. at 321. While defendant does not face the death penalty in this case, the concerns outlined in *Atkins* remain relevant in light of the evidence of his mental deficiencies and his resulting diminished personal culpability. Despite such concerns, however, this court has previously upheld the mandatory sentencing scheme at issue here in the face of a constitutional challenge brought by a mentally retarded defendant. *People v. Rice*, 257 Ill. App. 3d 220, 228-29 (1993) (rejecting constitutional challenge to life sentence imposed upon 16-year-old defendant with mild mental retardation).

¶ 68      We next consider the defendant's crimes; convictions on two counts of first degree murder. This state has long recognized that the murder of another human is "the highest crime known to the law." *People v. Winchester*, 352 Ill. 237, 248 (1933). Because of the moral depravity involved in such an offense, murders are deserving of the "most serious forms of punishment." *Graham*, 560 U.S. at ___, 130 S. Ct. at 2027. Nevertheless, we recognize that in this case defendant was convicted on a theory of accountability, for which a somewhat lower sense of moral culpability attaches than in situations where a defendant actually carries out a murder. *Enmund v. Florida*, 458 U.S. 782, 798 (1982); *Miller*, 202 Ill. 2d at 342. Despite this fact, we again note that the very sentence imposed here has previously survived similar constitutional challenges brought by defendants convicted of murder on an accountability theory. *Griffin*, 368 Ill. App. 3d at 379-80; *McCoy*, 337 Ill. App. 3d at 523-24 (collecting cases).

¶ 69      Lastly, we consider the severity of defendant's statutorily mandated sentence of natural life, without the possibility of parole. In *Graham*, the United States Supreme Court stated:

> "[L]ife without parole is 'the second most severe penalty permitted by law.' [Citation.] It is true that a death sentence is 'unique in its severity and irrevocability,' [citation]; yet life without parole sentences share some characteristics with death sentences that are shared by no other sentences. The State does not execute the offender sentenced to life without parole, but the sentence alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency–the remote possibility of which does not mitigate the harshness of the sentence." *Graham*, 560 U.S. at ___, 130 S. Ct. at 2027.

We again must note, however, that the very sentence defendant now challenges has been found constitutional by our supreme court. *Taylor*, 102 Ill. 2d 201 (refusing to find natural life sentence disproportionate where the legislature properly found it was required–in the public interest–for those convicted of multiple murders).

¶ 70      Taking all of these matters into consideration, we do not find defendant has demonstrated his sentence to be unconstitutionally disproportionate. First, no national consensus has been demonstrated against defendant's sentence, *i.e.*, a mandatory sentence of life in prison without the possibility of parole for an adult with mental retardation convicted on an accountability theory of multiple homicides. Indeed, we are unaware of *any* authority finding a sentence unconstitutional under such a fact pattern. Moreover, while defendant's sentence is certainly very significant, it is a lesser sentence than the death penalty sentence addressed

in some of the authority cited by defendant.[6] It must also be remembered that defendant stands convicted of two counts of "the highest crime known to the law." Lastly, and as discussed above, individual components of the factual situation presented here have previously been accepted as constitutional, *i.e.*, mandatory life sentences for mentally retarded defendants (*Rice*, 257 Ill. App. 3d at 228-29), or the same sentence imposed upon defendants convicted solely on a theory of accountability (*McCoy*, 337 Ill. App. 3d at 523-24). In light of all these considerations, we find that defendant's sentence falls within the legislature's "wide discretion to set penalties for the offenses it defines." *Kasp*, 352 Ill. App. 3d at 185.

¶ 71    In so ruling we necessarily reject defendant's specific reliance upon the decisions in *Atkins*, *Graham*, and *Miller*. First, while defendant relies upon the concerns expressed in *Atkins*, 536 U.S. at 307, to support his argument, that case clearly concerned a mentally retarded defendant sentenced to death and not one sentenced to life in prison. Furthermore, while in *Graham*, 560 U.S. at ___, 130 S. Ct. at 2030, the Supreme Court overruled a natural life sentence for a juvenile–who, because of their own characteristics, defendant contends can be analogized to adults with mental retardation–it clearly did so only in the context of a conviction for "nonhomicide offender[s]."[7] Finally, we find that our supreme court's decision in *Miller* actually supports our ruling and not defendant's argument. We previously summarized *Miller* as follows:

"In *Miller*, the 15-year-old defendant was convicted of two counts of first-degree murder based on accountability when he acted as a lookout. [Citation.] The circuit court refused to impose the statutorily mandated sentence of natural life imprisonment under the multiple-murder provision of the Unified Code of Corrections [citation], finding that application of the statute to Miller would violate the proportionate penalties clause. [Citation.] The circuit court instead sentenced him to 50 years in prison. [Citation.]

On appeal, the supreme court noted that a sentence of natural life imprisonment would be the result of three converging statutes: (1) the automatic transfer statute, which 'mandates that all 15- or 16-year-old offenders charged with murder be automatically transferred and prosecuted as adults in criminal court'; (2) the accountability statute [citation], which 'effectively bars courts from considering the offender's degree of participation in the crime by making all persons who participate in a common criminal design equally responsible;' and (3) the multiple-murder sentencing statute [citation],

---

[6]With the abolition of the death penalty, it is obviously now the most severe sentence possible in this state. Pub. Act 96-1543 (eff. July 1, 2011) (adding 725 ILCS 5/119-1).

[7]The constitutionality of life sentences without the possibility of parole for juveniles convicted of murder is a question now pending before the United States Supreme Court. *Miller v. State*, 63 So. 3d 676 (Ala. Crim. App. 2010), *cert. granted*, ____ U.S. ____, 132 S. Ct. 548 (2011); *Jackson v. Norris*, 2011 Ark. 49, 2011 WL 478600, *cert. granted*, ____ U.S. ____, 132 S. Ct. 548 (2011). Oral arguments in these two cases were held on March 20, 2012. See Supreme Court of the United States, *Hearing List for the Session Beginning March 19, 2012*, http://www.supremecourt.gov/oral_arguments/hearinglists/HearingList-March2012.pdf.

which 'does not allow a court to consider the age of the offender or the offender's participation in the crime at the time of sentencing.' [Citation.] The supreme court further noted '[w]hen these three statutes converge, a court never considers the actual facts of the crime, including the defendant's age at the time of the crime or his or her individual level of culpability.' [Citation.]

The supreme court held that the mandatory life sentence 'grossly distorts the factual realities of the case and does not accurately represent defendant's personal culpability such that it shocks the moral sense of the community. This moral sense is particularly true *** where a 15-year-old with one minute to contemplate his decision to participate in the incident and stood as a lookout during the shooting, but never handled a gun, is subject to life imprisonment with no possibility of parole–the same sentence applicable to the actual shooter.' [Citation.] The supreme court held that the multiple murder sentencing statute, as applied to the defendant there, violated the proportionate penalties clause. [Citation.]" *Salas*, 2011 IL App (1st) 091880, ¶¶ 71-73 (quoting *Miller*, 202 Ill. 2d at 340-41).

¶ 72    However, "[t]he facts in *Miller* are unique and its holding limited to a situation where the convergence of the automatic transfer statute, the accountability statute, and the multiple-murder sentencing statute resulted in mandatory life imprisonment without the possibility of parole for a 15-year-old lookout because the court was precluded from considering the actual facts of the case during sentencing." *Salas*, 2011 IL App (1st) 091880, ¶ 74. In this case, we are obviously not faced with the unique convergence of three separate statutory provisions.

¶ 73    Moreover, acknowledging that the defendant in *Miller* was convicted on an accountability theory and was a minor, and accepting for the moment defendant's argument that adults with mental retardation such as him should in principal be considered no more culpable than minors, we note that in *Miller* the supreme court specifically stated: "Our decision does not imply that a sentence of life imprisonment for a juvenile offender convicted under a theory of accountability is never appropriate. It is certainly possible to contemplate a situation where a juvenile offender actively participated in the planning of a crime resulting in the death of two or more individuals, such that a sentence of natural life imprisonment without the possibility of parole is appropriate." *Miller*, 202 Ill. 2d at 341. Accepting defendant's position that minors and adults with mental retardation are to be treated similarly in a proportionality analysis, we find that this language also intimates a willingness on the part of our supreme court to accept as appropriate a sentence of natural life imprisonment without the possibility of parole for a mentally retarded adult in the proper circumstances. See also *Roper v. Simmons*, 543 U.S. 551, 578-79 (2005) (after finding that the death penalty was unconstitutional as applied to minors, the Supreme Court explicitly *affirmed* the state supreme court's decision to resentence minor defendant to life in prison without the possibility of parole).

¶ 74    We find such circumstances present here, where the evidence established that defendant was an admitted gang member with a significant criminal history and that he was aware of the robbery plan before he traveled to G-Red's home, knew that Mr. Singleton's gun was loaded as he had previously examined it, knew that Mr. Singleton intended to kill G-Red,

concealed his face before entering G-Red's home, and actively participated in the robbery. Again, "[i]t is a court's duty to construe a statute so as to affirm the statute's constitutionality and validity, if reasonably possible." *People v. Shephard*, 152 Ill. 2d 489, 499 (1992).

¶ 75     Finally, we again note that "[t]he penological justifications for the sentencing practice are also relevant to the analysis." *Graham*, 560 U.S. at ___, 130 S. Ct. at 2028. Such goals may include retribution, deterrence, incapacitation, and rehabilitation, but "choosing among them is within a legislature's discretion." *Id*. at ___, 130 S. Ct. at 2028. "A State has wide latitude in fixing the punishment for crimes to satisfy its penological interests and policies." *People v. Perkins*, 274 Ill. App. 3d 834, 838 (1995) (citing *Williams v. Illinois*, 399 U.S. 235, 242 (1970)). The " 'adoption of any one penological theory' " is not constitutionally mandated. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2028 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 999 (1991) (Kennedy, J., concurring in part and concurring in the judgment, joined by O'Connor and Souter, JJ.)).

¶ 76     Here, defendant may well be correct that the goal of rehabilitation will not be served by a sentence of natural life without the possibility of parole. However, our supreme court has found that, "in fixing a penalty for an offense, the possibility of rehabilitation is not given greater weight or consideration than the seriousness of the offense." *People v. Sharpe*, 216 Ill. 2d 481, 525 (2005). In upholding the very mandatory sentencing provision at issue here, our supreme court found that "the legislature considered the possible rehabilitation of an offender, as well as the seriousness of the offense of multiple murders, in determining that in the public interest there must be a mandatory minimum sentence of natural life imprisonment." *Taylor*, 102 Ill. 2d at 206. As such, the fact that this one particular goal is not served by the sentence at issue here does not render it invalid.

¶ 77     Furthermore, we also acknowledge that those with mental retardation are considered less personally culpable for their actions. See *Atkins*, 536 U.S. at 318-20. However, such personal culpability is *reduced* for such defendants; it is not eliminated. *Id*. at 318 (a defendant's mental "deficiencies do not warrant an exemption from criminal sanctions"). For example, here there was no evidence to suggest that defendant was not completely aware of the activities he agreed to take part in or the fact that Mr. Singleton intended to commit murder. Indeed, his own videotaped statements demonstrate that he was aware. He is therefore certainly subject to society's penological interest in retribution for his actual culpability for those actions.

¶ 78     With respect to the goal of deterrence, defendant notes that those with mental retardation are perhaps also less likely to be deterred by the possibility of a particular punishment. *Id.* at 318-20. We note that the discussion of this issue in *Atkins*, 536 U.S. at 318-20, was clearly focused on the specific issue of the deterrence effect of the death penalty, a sentence not at issue here. Defendant has not cited to any authority extending this analysis beyond the context of the death penalty, and this court is not aware of any.

¶ 79     Lastly, we find that the goal of incapacitation is certainly served by the sentence here. Defendant, an admitted gang member who had amassed a significant criminal record by the age of 19, now stands convicted of two counts of murder. Those murders were committed during a violent robbery in which defendant willingly participated, with the full knowledge

that Mr. Singleton intended to kill G-Red.

¶ 80      In the final analysis, we find the statutorily mandated sentencing practice at issue here constitutional. That said, we are not unaware of the significant sentence that has been imposed in this case, or the frustration the trial judge expressed in being statutorily compelled to impose that sentence upon defendant. However, as our supreme court long ago stated: "[t]he views of the persons vested with judicial power as to the wisdom, justice, propriety, reasonableness or sufficiency of legislative action, which is not prohibited by any of those limitations which the constitution imposes, cannot be considered in determining the question of legislative power." *People ex rel. Lewman v. Baird*, 307 Ill. 503, 522 (1923). Pursuant to *Graham*, we have brought our independent judgment to bear on this matter, but only with respect to the *constitutionality* of the sentencing practice at issue here.

¶ 81                                  III. CONCLUSION

¶ 82      For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 83      Affirmed.