2024 IL App (1st) 210986-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FIRST DIVISION
September 16, 2024

No. 1-21-0986

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 02 CR 23677 |
| | ) | |
| TONY WHITE, | ) | The Honorable |
| | ) | Vincent M. Gaughan, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justice Cobbs concurred in the judgment.
Justice Pucinski specially concurred.

**ORDER**

¶ 1   *Held:* The appellate court affirms the trial court's summary dismissal of a postconviction petition that raised claims of ineffective assistance of trial counsel and a proportionate penalties challenge to a mandatory life sentence for murdering multiple victims.

¶ 2   Petitioner Tony White appeals from the trial court's first-stage summary dismissal of his postconviction petition. He contends that it raised two arguable claims of ineffective assistance of counsel, due to trial counsel's failure to advise him of his right to testify at his trial and to seek suppression of his videotaped statement on the basis that he did not understand the *Miranda* warnings given. He further contends that it raised an arguable claim that the statute mandating life

without parole for the murder of multiple victims violates the proportionate penalties clause of the Illinois constitution (Ill. Const. 1970, art. I, § 11) as applied to him. For the following reasons, we affirm the trial court's summary dismissal.

¶ 3                                    I. BACKGROUND

¶ 4        On May 7, 2001, Donna Wright and her 22-year-old son Jerome Wright were shot while inside their apartment on Chicago's West Side. Donna was found dead the following afternoon. Jerome was found alive but died a year and a half later from his injuries. Petitioner, who had been Donna's boyfriend for about 12 years, confessed to shooting both victims in a videotaped statement. He was eventually convicted of two counts of first degree murder, for which he is serving a mandatory sentence of natural life in prison.

¶ 5        At the time of the offense, petitioner was 36 years old. He had a mild intellectual disability, with an IQ in the bottom one percentile of the population. Petitioner was not found fit to stand trial until January 2008, at which time his jury trial took place.

¶ 6        In July 2003, petitioner's counsel filed a motion to suppress his videotaped statement. No copy of that initial motion to suppress is contained in the record on appeal, but later comments by counsel indicate that one of its bases for suppression was that petitioner " 'was incapable and unable to appreciate and understand the full meaning of his *Miranda* rights.' " The suppression hearing did not occur until March 2006. At a status hearing one month prior, petitioner's counsel informed the trial court that she was striking the above language from the petition; although counsel did not state a precise reason for this action, she indicated that she had recently discussed the issue of petitioner's understanding of *Miranda* with the defense's retained psychologist, Dr. Joan Lesko, after receiving reports from the State's retained psychologist and psychiatrist on the matter. Counsel thereafter filed an amended motion to suppress the statement that did not contain

this allegation concerning petitioner's inability to understand his *Miranda* warnings. The amended motion included the allegation that due to petitioner's full-scale IQ of between 66-67 and his mild intellectual disability, his statements were not voluntarily, knowingly, and intelligently made.

¶ 7        In August 2003, the trial court entered on order that petitioner undergo examination by the circuit court's forensic clinic services department to evaluate his fitness to stand trial, his sanity at the time of the alleged offense, and his ability to understand the *Miranda* warnings he had been given. Petitioner was then examined for six hours over two days in September 2003 by Erick A. Neu, Psy.D., a licensed clinical psychologist with the forensic clinical services department. The report written by Dr. Neu stated that he performed testing that showed petitioner had a full-scale IQ of 60, placing him in the lowest 0.3 percentile of the population; a verbal IQ of 57, which was also in the lowest 0.3 percentile; and a performance IQ of 67, which was in the lowest 1 percentile. Dr. Neu found that he was not exaggerating his degree of impairment. Dr. Neu's report further stated that his opinion was that petitioner "would have been unable to understand his *Miranda* warnings." He explained in the report that petitioner was unable to paraphrase even a basic understanding of the individual *Miranda* warnings and could not apply them to various scenarios. He wrote that petitioner's low IQ, combined with his desire to please authority figures and being in a stressful situation, led him to acquiesce to the state's attorney's request to give his statement despite being unaware of what he was agreeing to or the possible consequences.

¶ 8        Petitioner's suppression hearing was the basis of multiple issues raised on direct appeal, and accordingly a full recitation of the facts surrounding that hearing is set forth in our prior decision. Pertinent to this appeal, Dr. Neu was called as a witness on behalf of petitioner. In questioning Dr. Neu, petitioner's counsel did not elicit from him any opinion about whether petitioner understood the *Miranda* warnings that he had been given prior to his statement. Dr. Neu did testify as to his

findings concerning petitioner's low IQ and his intellectual disabilities. He also acknowledged on cross-examination that a low IQ did not mean that petitioner could not make free and rational choices. Detectives James Adams and Gregory Jones of the Chicago Police Department both gave testimony that petitioner did not appear mentally impaired or disabled when they spoke to him and that he never indicated that he did not understand when they advised him of his *Miranda* rights. Petitioner's videotaped statement was viewed by trial court. In argument, petitioner's counsel did not argue that petitioner did not understand his *Miranda* warnings, and counsel did not connect the evidence of petitioner's low IQ to his understanding of them. Rather, counsel argued that the detectives had taken advantage of his low IQ to coerce him into making a statement.

¶ 9     The trial court denied the motion to suppress, finding that the allegation that petitioner lacked the capacity to knowingly or voluntarily waive his *Miranda* rights had been disproven beyond a preponderance of the evidence. The trial court referenced the evidence of petitioner's low IQ, but it also noted that petitioner exhibited a calm demeanor in the video, seemed capable of understanding the concept of circumstantial evidence, and "was able to detail an elaborate course of events with complex facts" occurring before, during, and after and in different locations.

¶ 10    At the jury trial, petitioner's counsel pursued the defense that petitioner had acted in what he believed was self-defense when he shot Donna and Jerome. Accordingly, petitioner's counsel ultimately argued for the jury to find him guilty of second degree murder, not first degree murder.

¶ 11    Petitioner's videotaped statement was introduced into evidence and played for the jury through the testimony of Assistant State's Attorney Colleen Daly, who conducted the interview of petitioner as part of her felony-review duties on May 8, 2001. The statement begins with Daly giving petitioner *Miranda* warnings. Petitioner indicated that he understood them and that he agreed to give a videotaped statement.

¶ 12    In his statement, petitioner stated that on the evening of May 6, 2001, he had been at his aunt's house with his brother, who was visiting from Arkansas. At around 10:30 or 11 p.m., petitioner's brother drove him home to the apartment that he shared with Donna and Jerome, both of whom were then home. Petitioner went into the bedroom that he and Donna shared and found Donna sitting on the bed watching TV. An argument ensued, in which Donna "went into a jealous rage." Petitioner explained that Donna did not believe that he had been with his brother at his aunt's house. Instead, she thought that he had been with another woman. At some point during their argument, Donna got up and pushed him; petitioner told her not to put her hands on him. He stated that she also "started punching me, hitting me about three or four times" in the face. She also "bust my lip," which petitioner explained "made me kind of spooky and scared cause I don't know what she gonna do to me. Cause I know I can't whoop her, you know." This argument occurred while both he and Donna were inside the bedroom. Eventually petitioner got up, and Donna demanded petitioner give her his keys. Petitioner refused, and Donna took his keys out of his back pocket. Petitioner then retrieved a different set of keys from a drawer. He left and went outside the apartment, onto the back porch.

¶ 13    Petitioner came back inside and returned to the bedroom. When he did this, Donna got up and went into the bathroom. Petitioner stated that, at that point, he was scared. He was thinking that he did not know what she might do, as "she told me once before, she'll shoot me." He confirmed that she did not make this threat that night, but she had "told me a million times, she'll shoot me. *** She ain't scared to use no gun. She know how to use one already." Petitioner knew there was a handgun underneath the bed. He retrieved it and put it into his pocket, but he stated that he "wasn't intending to do nothing with it when I got it." After Donna returned to the bedroom, petitioner returned to the back porch where he remained for about 10 minutes. During that time,

he was checking whether the gun was loaded. The gun did not fire when he first tested it. After realizing that he needed to push the safety up, "I just put it in the air and it went off."

¶ 14    He then went back inside the apartment. He picked up what he described as a couch cushion or pillow, and he went to Jerome's room. Petitioner then explained that earlier, when Donna had left the bedroom to go into the bathroom, she had stopped at Jerome's door to talk to him. Petitioner stated that he overheard Jerome tell Donna not to worry about it and that Jerome said he would "take care of my ass." Hearing that made petitioner think that Jerome might be planning to do something to him. When petitioner opened the door to Jerome's room, Jerome was sitting on his bed watching TV with loud music playing. Jerome did not have a gun in his hand. Petitioner put the cushion over the gun and fired a shot into Jerome's room. He did not know why he used the cushion but stated that he thought it might make the gunshot quieter. He closed the door and left without noticing whether the shot hit Jerome. Petitioner stated that he next went to Donna's bedroom, where the door was closed. When he opened the door, Donna was laying down. She raised up, and petitioner shot her in the head. Donna did not have a gun in her hand at that time.

¶ 15    Petitioner stated that he then went to the nearby home of his uncle Darris Hobbs. He told Hobbs that he had shot Donna and Jerome and that he was "tired of getting abused, you know, by the same woman all the time." Petitioner was again asked by Assistant State's Attorney Daly whether Donna pointed a gun at him that night; he answered no, "but she had talked about shooting me" and said that "if I was with another woman she would kill me." He stated that Donna did not mention shooting him that night, "but I knew if it really came up to that point she probably would have. But if we would have stayed there and fought, we probably would have."

¶ 16    Petitioner's counsel cross-examined Assistant State's Attorney Daly about her questioning of petitioner during his statement. In summary, petitioner's counsel sought to establish that Daly

had shaped petitioner's statement in a way that elicited only incriminating facts while limiting details that were potentially exculpatory or related to his belief that he needed to act in self-defense. Specifically, counsel sought to establish through cross-examination that Daly had chosen not to ask follow-up questions on the topics of how Donna physically pushed him during the argument that night, her history of physically abusing petitioner, her past threats to shoot him, her history of using guns, the conversation that petitioner overheard between Donna and Jerome, and the reasons why petitioner felt threatened or scared of what Donna or Jerome might do to him that night.

¶ 17        The State also presented the testimony of six witnesses who had interactions with petitioner between approximately 2 a.m. and 3:30 p.m. on May 7, 2001. Tomeka Collins testified that at 2 a.m. she was in the alley talking on her phone adjacent to Jerome's bedroom window when petitioner appeared in that window and asked if he could use her phone. She allowed him to do so, and she overheard petitioner tell the person he called that "he need[ed] to hurry up and get to Mississippi, for someone to come and get him." Patricia Wright testified that she heard a gunshot that night, which she did not initially investigate. About half an hour after that, which would have been around 2:30 or 3 a.m., petitioner knocked on a window of her apartment and asked to use her phone, but she told him no. Darris Hobbs testified that petitioner came to his house around 2:30 or 3 a.m. and told him that he had "shot his old lady and stepson." Petitioner did not tell him that he and Donna had a fight that night or that she had hit him. Hobbs testified that petitioner returned sometime later and asked if he could put a gun in his basement. Hobbs refused, and petitioner left.

¶ 18        Yolanda Boens testified that at about 7 a.m., petitioner came to her house and asked her to take a bag from him that contained a handgun. Boens agreed to take the bag, and she gave it to her son. Raymond Williams, a close acquaintance of petitioner, testified that petitioner was walking down the street around 8 a.m. Petitioner said to him that he did not want to go home because Donna

would be mad that he had been out all night. Petitioner thus rode with Williams to take his children to school and then went back to Williams' house to watch a movie. Petitioner stayed with Williams until about 2:45 p.m., at which point Williams dropped petitioner at a Radio Shack on his way to work. Shirley Neal, Tomeka Collins, and James Collins all testified that at around 3:30 p.m., they saw petitioner in the courtyard of the apartment complex wearing black gloves. Neal testified also that she saw petitioner throw a pillow into a garbage can at that time. Someone asked petitioner where Jerome was, and petitioner responded that he had been shot. James Collins then followed petitioner into his apartment and saw that Jerome had been shot. Tomeka Collins called the police.

¶ 19       Officer Todd Reykjalin of the Chicago Police Department arrived on the scene and petitioner, who was wearing black leather gloves, directed him and other officers to the location of the victims. Another officer called an ambulance for Jerome, who was alive but unresponsive. Petitioner was detained after Officer Reykjalin observed him remove and attempt to conceal the leather gloves and "almost exiting through the back door."

¶ 20       Petitioner was transported to a police station, where Detectives Jones and Adams interviewed him. Detective Jones testified that, after being given *Miranda* warnings, petitioner agreed to speak with them. He initially denied involvement in the shootings and told them he had spent the night at his aunt's house. Eventually, however, petitioner confessed to shooting both Donna and Jerome. Detective Jones testified that petitioner provided a statement materially consistent with the one set forth above, except that Detective Jones stated that petitioner said that he placed the gun directly on Donna's forehead. Detective Jones also testified on cross-examination that petitioner did not say anything to the detectives about fearing what Donna might do to him that night, including fearing that she would shoot him with a gun.

¶ 21       In the defense case, petitioner's counsel recalled Detective Jones, who confirmed that Hobbs

had told him during his investigation that petitioner said "[t]hey pushed me into it." Hobbs also said to Detective Jones that petitioner told him that he and Donna had a fight that night in which Donna slapped him in the head and hit him in the eye.

¶ 22     Clifton White, who is petitioner's brother, testified that sometime after 10:30 or 11 p.m., he drove petitioner home to his apartment and went inside with him. He testified that petitioner went into Donna's bedroom and closed the door. He could hear Donna yelling but could not make out what was being said. After about 10 or 15 minutes, Donna came out of the bedroom, went into the bathroom, and slammed the door. Clifton told petitioner that he was leaving. The two of them went outside and sat together in Clifton's car for a moment, and Clifton urged petitioner to come back to Arkansas with him. Petitioner did not want to do that, and Clifton left. On cross-examination, Clifton testified that he did not see Donna hit petitioner or see any injury to petitioner.

¶ 23     Dr. Neu also testified in the defense case to his evaluation of petitioner in September 2003. He testified that petitioner had discussed during his interview that he was "quite fearful of Donna," that on one occasion she had caused him to bleed after striking him with a broomstick, that on another occasion she had stabbed him in the nose with a knife, and that Donna possessed a gun, which she was "not afraid to use." Dr. Neu testified that petitioner had recounted that he felt fearful for his life; he was fearful that Donna or Jerome might be plotting to kill him, as he would often hear them talking and felt left out when they would not include him in conversations. Dr. Neu stated that petitioner told him that on the day of the incident, Donna " 'busted his lip' " and had been hitting him that day. According to Dr. Neu, petitioner "claimed during the evaluation that he felt as though his life was in danger so he claimed that he felt that he had to do what he did."

¶ 24     Dr. Neu further testified to the results of tests he had administered to petitioner, which showed that petitioner had IQ scores in the bottom one percentile of the population. Petitioner was only

able to read basic words and had a limited vocabulary. Dr. Neu would often have to rephrase questions to him. Petitioner's insight, judgment, and impulse control were limited by his cognitive impairments, and he lacked the reasoning abilities of a person with a higher IQ. Dr. Neu testified that, at the time of his evaluation, petitioner also had a diagnosis of major depression, which was severe with psychotic features. On cross-examination, Dr. Neu testified that petitioner told him that neither Donna nor Jerome had never pulled a gun on him and that Jerome had never done anything to him physically.

¶ 25    In closing argument, petitioner's counsel argued that nothing about the shootings was planned. Counsel argued that the evidence showed that petitioner was scared that Donna and Jerome were going to hurt him following the argument that night, and thus he believed, albeit unreasonably, that he needed to defend himself by shooting them. The jury was instructed on the issues of self-defense and second degree murder, and petitioner's counsel argued that he should be found guilty of second degree murder, not first degree murder.

¶ 26    The jury returned a verdict finding petitioner guilty of first degree murder as to both Donna and Jerome. Based upon his conviction for murdering more than one victim, the trial court imposed a mandatory sentence of natural life imprisonment. See 730 ILCS 5/8-1(a)(1)(c)(ii) (West 2000).

¶ 27    Petitioner filed a direct appeal, in which he raised four principal issues. Two of these issues presented arguments that his videotaped statement should have been suppressed based on testimony by Dr. Neu that he did not understand the *Miranda* warnings he had been given. See *infra* ¶¶ 47-48. Petitioner also raised issues involving the eliciting of hearsay evidence at trial and the questioning of jurors during jury selection. This court affirmed petitioner's conviction. *People v. White*, 402 Ill. App. 3d 1193 (2010) (table) (unpublished order under Illinois Supreme Court Rule 23). The supreme court thereafter denied leave to appeal. *People v. White*, 239 Ill. 2d 586

(2011) (table).

¶ 28    In May 2021, the *pro se* petition for postconviction relief that is the subject of this appeal was filed in the circuit court. It presented three claims. First, it asserted that petitioner's right to effective assistance of counsel had been violated when his trial counsel failed to inform him of his right to testify at trial.[1] Petitioner alleged that counsel never spoke to, advised, or informed him of his right to testify. He stated that his counsel's failure to discuss with and prepare him to testify as to his fear of Donna, the constant mental and physical abuse suffered at her hands, and the role these circumstances played in the events leading to the shooting denied the jury important testimonial evidence. This claim was supported by petitioner's own affidavit in which he averred that his trial counsel never talked to him about testifying. He further averred in his affidavit that he wanted to testify and "tell the jury how Donna would always hit me and beat on me and call me names all the time. I wanted them to know how scared I was of her and how she had stabbed me before and threatened to shoot me."

¶ 29    Second, the petition asserted a claim of ineffective assistance in that trial counsel "failed to conduct a proper pre-trial investigation of [petitioner's] domestic background and his mental capacity," which "could have led to the trial court ruling differently on the question of whether [petitioner's] statement to the police was made knowingly and voluntarily." Third, the petition asserted a claim that petitioner's mandatory sentence of natural life in prison violated article I, section 11 of the Illinois Constitution (Ill. Const. 1970, art. I, § 11), as applied to him, because the trial court was prevented from considering his intellectual disability as a mitigating factor.

¶ 30    The trial court reviewed the petition, found that all claims raised in it were frivolous and

---

[1] The petition also asserted a related claim that the trial court failed to admonish him of his right to testify and to ensure that his waiver of that right was knowing and voluntarily. Petitioner does not pursue this claim on appeal.

patently without merit, and summarily dismissed the petition. Petitioner appeals this ruling.

¶ 31                                    II. ANALYSIS

¶ 32                     A. Advising Petitioner of Right to Testify

¶ 33        Petitioner's first contention on appeal is that he presented an arguable claim that he was denied effective assistance of counsel due to his counsel's complete failure to advise him that he had the right to testify in his own defense. He contends that if he had been allowed to testify and to explain in his own words why he shot Donna and Jerome, there is an arguably reasonable probability that he would have been found guilty only of second degree murder.

¶ 34        Summary dismissal of a postconviction petition is proper in cases where the trial court conducts an independent examination of it within 90 days of filing and, taking the allegations as true, "determines the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2022). Generally, a petition only needs to state the "gist" of a constitutional claim to avoid summary dismissal. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). A petition may be dismissed at this first stage of postconviction proceedings where it has no arguable basis in law or fact, meaning it relies on an indisputably meritless legal theory or fanciful factual allegations. *Id.* at 16-17.

¶ 35        To survive summary dismissal, a petitioner is required only to present a limited amount of detail, not formal legal argument or citations to authority. *People v. Hatter*, 2021 IL 125981, ¶ 24. However, this does not mean that a *pro se* petitioner is excused from providing factual details to support the claim that an alleged constitutional violation occurred. *Id.* A petition alleging nonfactual and nonspecific assertions that merely amount to conclusions will not survive summary dismissal. *People v. Morris*, 236 Ill. 2d 345, 354 (2010). Our standard of review is *de novo*, and we may affirm summary dismissal on any basis supported by the record. *People v. Thompson*, 2022 IL App (1st) 200463, ¶ 24.

¶ 36    A petition alleging ineffective assistance of counsel may not be summarily dismissed at the first stage of postconviction proceedings if (1) it is arguable that counsel's performance fell below an objective standard of reasonableness and (2) it is arguable that the petitioner was prejudiced by that deficient performance. *Hodges*, 234 Ill. 2d at 17; accord *People v. Joiner*, 2024 IL 129784, ¶ 33. Both prongs of this test must be satisfied. *People v. Bush*, 2022 IL App (1st) 210509, ¶ 31.

¶ 37    In this instance, taking the allegations of the petition as true, we accept petitioner's argument that his counsel's complete failure to advise him of his right to testify satisfies prong (1) above. See *United States v. Teague*, 953 F.2d 1525, 1534 (11th Cir. 1992). Thus, the issue is whether the petition makes an arguable showing as to prong (2), *i.e.*, that petitioner was arguably prejudiced by the deficient performance. This requires a showing by petitioner that "it is *arguable* that the outcome of his case would have been different absent the deficient representation." (Emphasis in original.) *People v. Wilson*, 2013 IL App (1st) 112303, ¶ 20; accord *Joiner*, 2024 IL 129784, ¶ 37.

¶ 38    Petitioner's contention on this point is that it is arguable that the jury would have found him guilty only of second degree murder, not first degree murder, if he had been allowed to take the stand and testify to his reasons for shooting Donna and Jerome. Regarding the testimony petitioner wanted to provide, he states in his affidavit, "I wanted to tell the jury how Donna would always hit me and beat on me and call me names all the time. I wanted them to know how scared I was of her and how she had stabbed me before and threatened to shoot me." In the petition itself, petitioner also mentions wanting "to testify as to his fear of [Donna], the constant mental and physical abuse at the hands of [Donna], and the role these circumstances played in the events leading to the shooting of [Donna]."

¶ 39    We conclude that nothing about this proposed testimony makes it arguable that petitioner's conviction would have been mitigated to second degree murder if petitioner had been allowed to

present it. The offense of second degree murder is committed when a person commits the offense of first degree murder and, at the time of the killing, he believes that his use of force is necessary to prevent "imminent death or great bodily harm" to himself or another, but his belief is unreasonable. 720 ILCS 5/9-2(a)(2), 7-1 (West 2000); see *People v. Reid*, 179 Ill. 2d 297, 308 (1997). To reduce an offense from first degree murder to second degree murder, the burden is on the defendant to prove that he believed that his use of force was necessary. *Reid*, 179 Ill. 2d at 308.

¶ 40    In our view, the key shortcoming in petitioner's affidavit and petition is that they present no facts suggesting that petitioner believed he faced *imminent* death or great bodily harm at the time he shot Donna and Jerome. At best, they show that petitioner was frequently subjected to non-lethal physical and verbal abuse by Donna, that he was scared of her, and that on past occasions she had stabbed him and threatened to shoot him. However, these facts involving her past conduct toward him have no bearing on whether he believed he faced "imminent death or great bodily harm" to himself at the moment of the shootings, which the shootings were necessary to prevent. 720 ILCS 5/9-2(a)(2), 7-1 (West 2000); *Reid*, 179 Ill. 2d at 308. This is particularly true where the trial evidence showed that both Donna and Jerome were laying on their beds with their bedroom doors closed immediately prior to being shot and that neither victim had a gun in hand. Accordingly, it is not arguable that, if petitioner had testified to the facts set forth in his affidavit, the jury would have been provided with the evidence necessary to alter the outcome of his trial to a second degree murder conviction.

¶ 41    Several points bolster our conclusion that presenting these facts would not arguably change the outcome of petitioner's trial. Primarily, this is clearly the defense that petitioner's counsel attempted to mount on his behalf at trial. As such, the facts set forth in petitioner's affidavit were all before the jury through petitioner's videotaped statement and the testimony of the defense

witnesses, particularly the testimony of Dr. Neu. There was sufficient evidence to warrant a jury instruction on second degree murder, but that evidence was not strong, particularly as to the belief of imminent death or great bodily harm. Nevertheless, counsel forcefully made the argument to the jury that the direct and circumstantial evidence supported a conviction for second degree murder, and the jury rejected this argument. While petitioner argues that Assistant State's Attorney Daly consciously shaped his statement to limit its ability to support a defense and that Dr. Neu's testimony was filtered through his own perceptions and undermined on cross-examination, the problem remains that the facts in petitioner's affidavit are not facts that would mitigate his conviction to second degree murder. As the petition and affidavit fail to show that it is arguable that the petitioner was prejudiced by counsel's deficient performance, we affirm the summary dismissal of this claim.

¶ 42                    B. Understanding of *Miranda* Warnings as Basis for Suppression

¶ 43        Petitioner's second contention is that he presented an arguable claim that he was denied effective assistance by trial counsel's failure to seek suppression of his statement on the grounds that petitioner did not understand the *Miranda* warnings given to him prior making it. In support of this argument, petitioner cites the opinion expressed by Dr. Neu in his report of September 2003 that petitioner would have been unable to understand his *Miranda* warnings. Petitioner also cites the facts relied upon by Dr. Neu that served as the basis for this opinion. Petitioner argues that Dr. Neu's opinion provided an arguably meritorious basis for suppression and that counsel was therefore ineffective for failing to rely on it as grounds for suppression.

¶ 44        The State first responds that the argument as formulated on appeal is different than the claim raised in the petition and that forfeiture applies it for this reason. See *supra* ¶ 29. However, we agree with petitioner that his *pro se* phrasing of the claim in his petition sufficiently encompasses

this argument as advanced on appeal. We therefore reject the State's first argument for forfeiture.

¶ 45    The State fares better on its second argument for forfeiture, which is that the present claim is "a repackaged version of the argument this Court rejected on direct appeal." It argues for this reason that principles of *res judicata* and forfeiture apply to bar consideration of this claim.

¶ 46    "[I]n Illinois, defendants are required to raise ineffective assistance of counsel claims on direct review if apparent from the record." *People v. Veach*, 2017 IL 120649, ¶ 46 (citing *People v. Kokoraleis*, 159 Ill. 2d 325, 328 (1994)). A defendant who fails to raise an ineffective assistance claim on direct appeal risks forfeiting that claim as grounds for later postconviction relief. *Id.* ¶ 47. This is because a postconviction petition offers a defendant the opportunity to mount a collateral attack on the underlying judgment, but " 'the attendant proceeding is not a substitute for, or an addendum to, direct appeal.' " *Id.* ¶ 46 (quoting *Kikoraleis*, 159 Ill. 2d at 328). Accordingly, principles of *res judicata* and forfeiture have long been recognized to preclude consideration in postconviction proceedings of claims that were or could have been earlier raised on direct appeal. *Id.* Any issues that could have been raised on direct appeal are forfeited. *People v. Simpson*, 204 Ill. 2d 536, 551 (2001). Moreover, where the issue of the effectiveness of trial counsel has been determined on direct appeal, the "addition of somewhat different allegations of incompetence" in a postconviction petition will not overcome the application of *res judicata*. *People v. Albanese*, 125 Ill. 2d 100, 105 (1988). Summary dismissal of a claim barred by *res judicata* or forfeiture is proper, as such a claim is necessarily frivolous or patently without merit. *People v. Blair*, 215 Ill. 2d 427, 445 (2005).

¶ 47    In petitioner's direct appeal, he raised two arguments that touched upon the issue of his lack of understanding of the *Miranda* warnings given and the opinion expressed by Dr. Neu on this matter following the September 2003 evaluation. Petitioner's first argument was that the trial court

erred in denying the motion to suppress when it relied too heavily on its own observation of his videotaped statement and "did not adequately consider [Dr. Neu's] conclusion that [petitioner] was unable to understand the *Miranda* warnings." Among the evidence that petitioner argued the trial court failed to consider was the report submitted to the court by Dr. Neu opining that petitioner was unable to understand the *Miranda* warnings and explaining the basis for this opinion. This court rejected this argument, finding it within the province of the trial court to determine the weight to be given to Dr. Neu's testimony relative to other evidence presented at the suppression hearing.

¶ 48 Petitioner's second argument on direct appeal that touched on this topic was that his counsel had been ineffective during the suppression hearing in failing to "elicit[ ] testimony from Dr. Neu stating that he found [petitioner] unable to understand his *Miranda* warnings." In making this argument, petitioner again relied on the statement Dr. Neu's September 2003 report. Petitioner criticized his trial counsel for using Dr. Neu's testimony only to focus on petitioner's low IQ without further "eliciting how that low IQ would impact his understanding of *Miranda* warnings." This court again rejected this argument, reasoning that counsel's decision to argue that petitioner's statement was the product of police coercion due to his low IQ, rather than that he was unable to understand his *Miranda* warnings, constituted a reasonable trial strategy. We noted that the record reflected that this was a conscious decision by counsel to strike the allegation from the original motion to suppress that petitioner "was incapable and unable to appreciate and understand the full meaning of his *Miranda* rights" and not to include this allegation in the amended motion.

¶ 49 We find the State's argument that *res judicata* applies here to be well-taken. Even if the petition presents "somewhat different allegations of incompetence," the issue of trial counsel's effectiveness on this point is *res judicata*. *Albanese*, 125 Ill. 2d at 105. The doctrine of forfeiture also applies here, because this is a claim that petitioner could have presented on direct appeal. It is

clear from the preceding paragraphs that the necessarily factual predicate for this argument existed in the record at the time of direct appeal.

¶ 50    Petitioner disputes this and argues in his reply brief that the "crux" of his present claim of ineffective assistance was not part of the record at the time of direct appeal, that being "counsel's motivation for failing to base his motion on Dr. Neu's determination that [petitioner] was intellectually incapable of understanding the *Miranda* warnings." We disagree that the record was inadequate to resolve the claim. Our supreme court has rejected the argument that a claim of ineffective assistance cannot be resolved on direct appeal where the record lacks an indication of defense counsel's motivation for a course of conduct. See *Veach*, 2017 IL 120649, ¶¶ 49-50.

¶ 51    In this case, the state of the record at the time of direct appeal was adequate for the court to have resolved the present claim of ineffective assistance. Even though counsel's precise motivation was not stated on the record, there was evidence strongly suggesting an explanation for counsel's decision to strike the allegation that petitioner was incapable of understanding the *Miranda* warnings. Counsel statements in court on January 10, 2006, and February 15, 2006, show that she made the decision to strike this allegation immediately after consulting with the defense's retained psychologist, Dr. Lesko, following the receipt of reports by the psychologist and psychiatrist retained by the State to evaluate petitioner and address the issue of his understanding of *Miranda*. The reasonable inference is that counsel determined following this consultation with Dr. Lesko that the defense lacked testimony from Dr. Lesko or the other mental health professionals to advance this argument for suppression. This also explains why counsel relied at the suppression hearing on the testimony of Dr. Neu instead of Dr. Lesko but was careful not to elicit opinions concerning petitioner's understanding of *Miranda*. Again, the point is not to resolve this issue but to explain that this argument for ineffective assistance could have been decided on direct appeal.

¶ 52    In conclusion, principles of *res judicata* and forfeiture apply to bar consideration of petitioner's second claim of ineffective assistance. For this reason, this claim necessarily meets the standard of being frivolous or patently without merit, and summary dismissal of it is affirmed.

¶ 53                    C. Sentence in Violation of Proportionate Penalties Clause

¶ 54    Petitioner's final contention on appeal is that he presented an arguable claim that the mandatory life sentence imposed due to his murdering of multiple victims violates his rights under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11), as applied to him. Petitioner was sentenced pursuant to a statute that required the trial court to impose a sentence of natural life imprisonment because he was "found guilty of murdering more than one victim." 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2008). Petitioner seeks to raise an as-applied challenge to the constitutionality of the mandatory life sentence he received under this statute. He contends that he was constitutionally entitled to receive a sentence that accounts for his lessened culpability and his amenability to rehabilitation.

¶ 55    Petitioner relies most heavily on the notion that his intellectual disability mitigated his culpability for the murders, by causing him to misread the intentions of Donna and Jerome as homicidal, preventing him from recognizing that nonviolent solutions existed, and leading him to act impulsively by shooting both victims. He contends also that both his culpability and the seriousness of the offense was mitigated by the fact that he had suffered physical and psychological abuse by Donna for over a decade. He argues that his life sentence cannot be justified on the premise that he is beyond rehabilitation, as shown by the fact that his prior criminal history was comprised of a single nonviolent misdemeanor conviction. He contends that the murders at issue were the product of specific circumstances not likely to recur, thus suggesting he is unlikely to commit further crimes or to pose a future danger to society. In light of all of these circumstances,

he contends, his natural life sentence arguably "shocks the moral sense of the community."

¶ 56    The proportionate penalties clause provides, "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Relevant here, a sentence violates this clause where the penalty imposed is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002). No more precise definition has been given of the kind of punishment that qualifies as such, because courts recognize that standards of decency and fairness that shape the community's moral sense will "evolve" over time. *Id.* at 339. A court faced with such a challenge will "review the gravity of the defendant's offense in connection with the severity of the statutorily mandated sentence within our community's evolving standard of decency." *Id.* at 340.

¶ 57    Petitioner's claim that his mandatory life sentence is arguably unconstitutional is frivolous or patently without merit. Initially, we agree with the State that this is a claim petitioner could have raised on direct appeal; he did not, and the claim is forfeited for that reason. See *Simpson*, 204 Ill. 2d at 551. However, even if we overlook forfeiture, petitioner's claim is foreclosed by the holdings of *People v. Taylor*, 102 Ill. 2d 201 (1984); *People v. Brown*, 2012 IL App (1st) 091940; and *People v. Coty*, 2021 IL 123972.

¶ 58    In *Taylor*, our supreme court recognized that the sentencing statute challenged by petitioner is constitutional. It held that the proportionate penalties clause is not violated when a defendant convicted of murdering multiple victims receives a mandatory sentence of natural life imprisonment. *Taylor*, 102 Ill. 2d at 206. After reiterating that the proportionate penalties clause does not require that the possibility of rehabilitation be given greater weight in determining a proper penalty than the seriousness of the offense, the court stated:

"We conclude that the legislature considered the possible rehabilitation of an offender, as well as the seriousness of the offense of multiple murders, in determining that in the public interest there must be a mandatory minimum sentence of natural life imprisonment. The rehabilitative objective of article I, section 11, should not and does not prevent the legislature from fixing mandatory minimum penalties where it has been determined that no set of mitigating circumstances could allow a proper penalty of less than natural life for the crimes of two or more murders." *Id.*

¶ 59        The court in *Taylor* was not addressing this argument with specific regard to a defendant with an intellectually disability. However, the later cases of *Brown* and *Coty* make clear that this otherwise constitutional mandatory life sentence is not rendered unconstitutional when it is imposed on a defendant with intellectual disabilities.

¶ 60        In *Brown*, 2012 IL App (1st) 091940, this court considered a substantially identical challenge to this same mandatory sentence, under both the proportionate penalties clause and the Eighth Amendment (U.S. Const., amend. VIII). Citing *Taylor*, we made quick dispatch of rejecting the defendant's as-applied argument that his intellectual disability rendered his life sentence unconstitutionally disproportionate to the gravity of his convictions for two murders. *Id.* ¶ 60.

¶ 61        We then turned to whether the federal or state constitutional provisions categorically prohibited the practice of imposing a mandatory life sentence on an intellectually disabled adult convicted of multiple homicides. *Id.* ¶¶ 61-80. In our analysis, we first found no objective indication that a national or community consensus existed opposing this sentencing practice. *Id.* ¶¶ 64-65. Second, we considered how the characteristics of intellectual disability affected a criminal defendant's culpability, quoting *Atkins v. Virginia*, 536 U.S. 304 (2002), and stating:

" '[Intellectually disabled persons] frequently know the difference between right and wrong

and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.' " *Brown*, 2012 IL App (1st) 091940, ¶ 67 (quoting *Atkins*, 536 U.S. at 318).

Third, we considered the severity of the offense, recognizing that first degree murder is the highest crime known to the law and deserving of the most severe forms of punishment. *Id.* ¶ 68. Finally, we considered that a natural life sentence is the second most severe penalty permitted by law, albeit one that has been held constitutional by our state supreme court. *Id.* ¶ 69.

¶ 62     After taking the above factors into consideration, we held that the defendant had not demonstrated his sentence to be unconstitutionally disproportionate to the offense of murdering multiple victims. *Id.* ¶ 70. We discussed the penological justifications for this sentencing practice, including retribution, deterrence, incapacitation, and rehabilitation, noting that choosing among them is the role of the legislature. *Id.* ¶ 75 (citing *Graham v. Florida*, 560 U.S. 48, 71 (2010)). We reasoned that society's interest in retribution applies to an intellectually disabled offender, whose personally culpability is reduced, not eliminated, because of their disability; and we found that the goal of incapacitation was served in the case before us. *Id.* ¶¶ 77, 79. And citing the above discussion from *Taylor*, we reasoned that "the fact that this one particular goal [of rehabilitation] is not served by the sentence at issue here does not render it invalid." *Id.* ¶ 76.

¶ 63    We recognize that, since this court's decision in *Brown*, the law has undergone substantial development with respect to sentencing practices that mandate life sentences for *juvenile* offenders convicted of homicide. However, these developments in the law of juvenile sentencing have no bearing on this case, where petitioner was 36 years old at the time of the offense. And in *Coty*, our supreme court rejected the argument that the rationale prohibiting life sentences without parole for juveniles extends to offenders with intellectual disabilities under the proportionate penalties clause. *Coty*, 2021 IL 123972, ¶¶ 14-17, 44. In other words, the court rejected the notion that the proportionate penalties clause requires that the " 'attendant characteristics of the defendant's intellectual disability and the fact that this disability diminishes both his culpability and the need for retribution' " be given consideration by a trial court imposing a statutorily mandated life sentence for a non-homicide offense. (Cleaned up.) *Id.* ¶ 16, 44 (quoting *People v. Coty*, 2018 IL App (1st) 162383, ¶ 87.)

¶ 64    The proportionate penalties clause challenge at issue in *Coty* was by an intellectually disabled adult defendant who had received a mandatory natural life sentence for a conviction of predatory criminal sexual assault of a child, which followed a prior conviction for aggravated criminal sexual assault. See 720 ILCS 5/12-14.1(b)(2) (West 2004). As with the statute at issue concerning life sentences for the murdering of multiple victims, the supreme court had previously found this mandatory sentence constitutional in a case not involving a defendant with intellectual disabilities. See *People v. Huddleston*, 212 Ill. 2d 107, 145 (2004). Thus, the court in *Coty* addressed whether anything about a defendant with intellectual disabilities convicted of the same offenses required a different result. *Coty*, 2020 IL 123972, ¶ 32.

¶ 65    The court reasoned that while an intellectual disability may lessen a defendant's culpability to the extent of precluding a sentence involving the death penalty, it is a " 'two-edged sword' " in

that it can increase the probability of future dangerousness. *Id.* ¶¶ 33-34 (citing *Atkins*, 536 U.S. at 318, 320, and quoting *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989)). The court cited the example that an intellectual disability may result in diminished impulse control, thereby increasing the risk that such a defendant poses a future danger to the community. *Id.* ¶ 35 (citing *People v. Heider*, 231 Ill. 2d 1, 20-21 (2008)). The court also reasoned that a defendant's intellectual disabilities result in a lower potential for rehabilitation than an offender without such deficits. *Id.* ¶ 37. Also, the static nature of an intellectual disability makes such a defendant different than a juvenile, whose mental development and maturation likely increases the potential for rehabilitation over time. *Id.* ¶¶ 37-40. Accordingly, the court held that the defendant's sentence of natural life imprisonment did not violate the proportionate penalties clause. *Id.* ¶¶ 42, 44.

¶ 66    Petitioner attempts to distinguish *Coty* by arguing that mandatory life sentences for repeat child sex offenders are appropriate given their high rates of recidivism, which he argues is not a concern in his case. We find the attempt to distinguish *Coty* on this basis unavailing. Ultimately, the holding of *Coty* that the proportionate penalties clause does not entitle an intellectually disabled adult defendant to have factors attendant to their intellectual disability taken into account when convicted of a *non-homicide* offense for which a natural life sentence is mandated by statute renders it inarguable that such a defendant is entitled to have these factors considered when being sentenced upon conviction for *multiple homicides*. The proportionate penalties clause argument raised by petitioner is indisputably meritless, and summary dismissal of this claim is affirmed.

¶ 67                                III. CONCLUSION

¶ 68    For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 69    Affirmed.

¶ 70    JUSTICE PUCINSKI, specially concurring:

¶ 71    The petitioner made it clear in his petition that he felt the failure of the court to advise him of his right to testify, or not, was error. The Illinois Supreme Court has made it clear that the trial court is under no duty to admonish the defendant of his right to testify or not. *People v. Smith*, 176 Ill. 2d 217, 234-35 (1997). However, in this case, there was sufficient evidence that the defendant was intellectually challenged, and it could be that he did not understand any discussion with his attorney about his rights. I think the trial court should have probed to determine if the decision not to testify was knowingly made by this defendant. I agree with the majority that even if the defendant had testified there is little chance that the result would have been different, where the evidence was clear. But taking extra steps with a defendant who is intellectually challenged would provide a fuller picture of his or her decision making.